**REVISED - December 30, 1999**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-10645

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WILLIAM DOUGLAS LANKFORD, III,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

November 16, 1999

Before KING, Chief Judge, and SMITH and STEWART, Circuit Judges.

KING, Chief Judge:

Following a jury trial, Defendant-Appellant William Douglas Lankford, III ("Lankford") was convicted of one count of kidnapping in violation of 18 U.S.C. § 1201, one count of interstate domestic violence in violation of the Violence Against Women Act of 1994 ("VAWA"), Pub. L. 103-322, Title IV, § 40221(a), 108 Stat. 1926, and one count of using or carrying a firearm during and in relation to commission of the above crimes of violence in violation of 18 U.S.C. § 924(c). He appeals both his conviction and sentence, asserting that (1) the kidnapping count was insufficient and as a result, his conviction was potentially based on legally inadequate grounds; (2) the kidnapping and interstate domestic violence counts were

multiplicitous; (3) the interstate domestic violence count was based on an unconstitutional statute; (4) comments and questions by the judge and arguments by the prosecutor rendered his trial unfair; (5) jury instructions were incomplete; (6) evidence was insufficient to support conviction on any count; and (7) his sentence was in violation of the Double Jeopardy Clause and exceeded the statutory maximum. We affirm.

## I.   FACTUAL & PROCEDURAL BACKGROUND

Lankford's conviction and sentence stem from events occurring August 8 and 9, 1995. Lankford's wife, Joanie, had moved out of the house they shared with their three children in Wichita Falls, Texas, in April 1995, taking the children with her. She had indicated a desire for a divorce in September 1994, and by April, divorce hearings were being held. They were still married at the time of Lankford's trial.

On August 8, Lankford purchased a set of handcuffs, proceeded to Wichita Falls' Midwestern State University, where his estranged wife was employed, and there waited for his wife to leave for lunch. Upon seeing her, Lankford ran to her, and claimed to have a gun. He attempted to force her into her car, but she resisted and a struggle ensued. During this struggle, Joanie saw a gun. Lankford told his wife that if she did not get into the car, he would kill her, and then himself. She believed him. Lankford eventually forced his wife into her car, took her keys, and then drove to a nearby church parking lot where he had parked his car. During this time, Lankford was yelling at

Joanie, angry about her attempts to avoid him.  He told her that he was going to make her talk to him.  At the church lot, Lankford forced her into his car, and once she was in the passenger seat, handcuffed her left wrist to the gear shift. Lankford's gun was in his car.  They proceeded to the interstate. Lankford put a towel over Joanie's handcuffs and warned her not to flag down police officers or anyone else.  He informed Joanie that they were going to Oklahoma to talk and that "they were going to make this work out one way or the other."  He also told her that they were going to get a motel room and spend the night. Joanie protested going to Oklahoma, citing her work and her need to take care of her mother.

During the trip to Oklahoma, Lankford's behavior frequently shifted from displays of anger to being calm.  They made several stops while still in Texas, once at a rest stop, once at a convenience store, and once to get gas.  The handcuffs were removed when they reached the rest stop.  Lankford at all times stayed close to his wife.  He waited outside while she went into a restroom, and stood near her when she did as Lankford instructed and called her workplace to say she was sick and would not be returning.  He had someone else fill the gas tank for him. Joanie believed he had a gun in his pocket at the rest stop and saw the gun when they stopped at the convenience store.  She did not cry out or attempt to flee because she feared that Lankford would shoot her.

Once in Lawton, Oklahoma, Lankford rented a motel room.

3

Joanie accompanied him to the office, but did not attempt to escape because of her fear of what he would do. Rather than go to the room right away, Joanie told him that they should pick up some things she needed, as Lankford had promised they would. She did not want to go to the room because she believed Lankford would try to have sex with her, which she did not want. Finding a cleaning cart at the door of the room, the pair went to Wal-Mart to purchase some make-up and clothes for Joanie, and to a drive-through restaurant to pick up some dinner. While at Wal-Mart, Joanie attempted to delay going to the motel by insisting she try on clothes other than the work-out clothes Lankford had picked out.

When they returned to the motel room, Joanie requested that Lankford not get drunk and not bring the gun into the room. He agreed, but brought beer into the room along with the dinner they had picked up and the packages from Wal-Mart. Joanie tried to eat, but felt sick. She told Lankford she felt as though she had to be ill. He told her to get in the bed, and began taking off her clothes. She got in bed, still wearing her underclothes, and pretended to go to sleep. Later, he also got in to bed, and began to take off her underclothes. She had her arms across her stomach, and said "Please don't." He nonetheless proceeded to have sex with her. Sometime after that, he had sex with her again. Joanie testified that she was still afraid of Lankford at this time, and felt there was no way out. The next morning, August 9, after answering a 5:00 a.m. wake-up call, Lankford

4

returned to bed and again had sex with Joanie.

The first time Lankford left Joanie alone was when they were preparing to leave the motel. His emotional state on the trip back to Wichita Falls was calm. He told Joanie not to tell the police or anyone else about the trip, and dropped her off near her car. Joanie then drove home, but afraid to stay there, went to the home of her boss. From there she went to the hospital. For two weeks afterward, Joanie stayed at a shelter.

Lankford was arrested on October 4, 1995, and indicted on October 31. The indictment charged Lankford with one count of interstate domestic violence, 18 U.S.C. § 2261(a)(1), one count of kidnapping, 18 U.S.C. § 1201, and one count of using or carrying a firearm during and in relation to crimes of violence. 18 U.S.C. § 924(c). Lankford filed a motion to dismiss either Count 1 or Count 2 because they were multiplicitous. That motion was denied. The Government was granted its motion for leave to introduce evidence of "other acts" under FED. R. EVID. 404(b) and 413(a). Those "other acts" included 1) a January 1995 incident during which Lankford, after arguing with his wife, prevented her from stopping or exiting the car he was driving by putting her in a head lock and threatening to break her neck. Maintaining the head lock after reaching their home, Lankford dragged his wife into the bedroom, and ordered her to remove her clothes. Joanie struggled and resisted. At one point, Lankford placed her in a potentially lethal karate hold, and at another point, while pinning her down with his knees, threatened that the children

5

would awaken the next morning as orphans.  The attack subsided, Lankford begged for sex, and then engaged in sex with Joanie; 2) a May 29, 1995 incident lasting approximately five hours during which Lankford, dressed in black and armed with a gun, broke in to his wife's separate residence at around 1:00 a.m. and, finding her sleeping with her boyfriend, struck and threatened to kill both of them.  With the boyfriend ordered to lay face down on the floor, Lankford ordered Joanie to perform oral sex on him, he performed sexual acts on her, and then ordered Joanie and her boyfriend to engage in specific sexual acts with each other; 3) a July 30, 1995 incident during which Lankford threatened to bind his wife with strips of duct tape that were hanging on the wall unless she submitted to having sex with him; and 4) a September 26, 1995 incident during which Lankford, after struggling with Joanie's boyfriend outside her residence, broke in to that residence.  Joanie, hearing the struggle outside, had armed herself with a small caliber weapon, and when Lankford, again dressed in black, entered, she fired one shot.  That shot entered the side of Lankford's head.  Lankford then beat Joanie repeatedly.  After Lankford was arrested for this incident, police found a folding knife in Joanie's house.

Lankford's first trial ended in a mistrial.  His second trial, which began on June 4, 1996 and lasted eight days, ended with the jury finding Lankford guilty on all counts.  Lankford filed a  motion for judgment of acquittal or in the alternative for a new trial.  This motion was denied October 31, 1996.

Lankford was sentenced to a term of 135 months as to Counts 1 and 2 to run concurrently, to a term of 60 months as to Count 3 to run consecutively, supervised release for a term of five years, a special assessment of $150 ($50 per count), and ordered to pay $562.50 in restitution to Joanie Lankford under 18 U.S.C. § 2265(c). He received credit for time served.

Lankford filed his notice of appeal November 6, 1996. This appeal was dismissed June 12, 1997 because Lankford's attorney failed to file a brief within this court's deadline, despite receiving several extensions. Lankford then filed an Unopposed Motion for Leave to File Brief Out of Time with this court, and counsel filed an Unopposed Motion to Reinstate Case. Both motions were denied on June 19, 1997. Lankford then filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, alleging ineffective assistance of counsel. A magistrate judge recommended that Lankford be granted permission to file an out-of-time appeal. The district court adopted that recommendation on May 13, 1998. Lankford timely appealed.

## II. CHALLENGES TO COUNTS OF THE INDICTMENT

Lankford argues, for the first time on appeal, that Count 2 of the indictment failed to give the district court jurisdiction because it omitted an essential element of 18 U.S.C. § 1201(a)(1): that he held Joanie Lankford when he willfully transported her across state lines. Also for the first time on appeal, he challenges the constitutionality of § 2261(a)(1), the statute he was charged with violating in Count 1 of the

7

indictment.  We address these challenges in turn.[1]

## A. Insufficiency of Count 2

"An indictment is sufficient if (1) it contains the elements of the offense charged, (2) it 'fairly informs' the defendant of the charge he must meet, and (3) there is no risk of future prosecutions for the same offense."  United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991) (quoting United States v. Gordon, 780 F.2d 1165, 1169 (5th Cir. 1986)).  Lankford asserts that the indictment was insufficient because it did not include all the elements of the crime with which he was charged.

Whether an indictment is sufficient is a question of law we review de novo.  See United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999).  Although challenges based on the failure to charge an offense may be made at any time, see FED. R. CRIM. P. 12(b)(2); United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996), if made for the first time on appeal, a court should read the indictment with "maximum liberality" and find it sufficient "unless it is so defective that by any reasonable construction, it fails to charge the offense for which the defendant is convicted."  Id. (footnote omitted).  The maximum liberality standard is appropriate where, as here, the appellant does not assert that he had no notice of the crime he was accused on committing.  See id. at 221 & n.1.  In assessing the

---

[1]     Lankford also argues that the district court improperly found that Counts 1 and 2 were not multiplicitous.  We address this argument below in our consideration of his additional contention that his sentence violated the Double Jeopardy Clause, U.S. CONST. amend. V.

8

sufficiency of an indictment, we focus on practical, not technical, considerations.  See Smith v. United States, 360 U.S. 1, 9 (1959) ("Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused."); United States v. Chaney, 964 F.2d 437, 446 (5th Cir. 1992).

In order to obtain a conviction under § 1201(a)(1), the government must prove "(1) the transportation in interstate commerce; (2) of an unconsenting person who is; (3) held for ransom, reward, or otherwise, and (4) the acts were done knowingly and willingly."  United States v. Osborne, 68 F.3d 94, 100 (5th Cir. 1995).  Count 2 of the indictment alleged that Lankford, in violation of 18 U.S.C. § 1201(a)(1),

> did willfully transport in interstate commerce from Wichita Falls, Texas to Lawton, Oklahoma, Joanie Lankford, who had been seized, confined, kidnaped, abducted, and carried away for ransom, reward, and otherwise, to wit, the defendant's sexual gratification.

Lankford's challenge rests on the absence of the words "and held" between "carried away" and "for ransom," an omission he asserts resulted in the indictment being insufficient.  We must decide whether this omission results in an indictment that, by any reasonable construction, fails to charge that Lankford was detaining his wife when he crossed state lines.

We find that the indictment is sufficient.  Lankford was charged with transporting his wife from Wichita Falls, Texas to Lawton, Oklahoma, a distance of over fifty miles.  Given the location of Wichita Falls relative to the Texas-Oklahoma border,

9

the two would have had to travel a distance before crossing into Oklahoma. Cf. United States v. Lewis, 662 F.2d 1087, 1089 (4th Cir. 1981)(finding that an indictment's statement that appellant transported the victim from Virginia to the District of Columbia alleged a holding); Hall v. United States, 410 F.2d 653, 659 (4th Cir. 1969) (finding that an indictment's charge that appellant transported the victim from Virginia to Pennsylvania alleged a holding at the time state lines were crossed for the second time). The indictment also charged Lankford with having "seized, confined, kidnaped, abducted, and carried away" his wife "for ransom, reward, and otherwise, to wit, the defendant's sexual gratification." We think Lankford's indictment adequately alleges his detention, at the time he crossed the Texas-Oklahoma border, of an unconsenting person for purposes of his receiving some benefit. Because we find Count 2 sufficient, Lankford's arguments regarding the possibility that his conviction on Counts 1 and 3 were based on legally inadequate grounds must fail.

## B. Constitutionality of 18 U.S.C. § 2261(a)(1)

Lankford also challenges the constitutionality of the statute he is charged with violating in Count 1 of his indictment. In the main, he asserts that in enacting § 2261(a)(1),[2] Congress exceeded its power under the Commerce

---

[2]    Section 2261(a)(1) provides that
A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or

10

Clause.  U.S. CONST. art. I, § 8.[3]  We review for plain error because this challenge is made for the first time on appeal.  See FED. R. CRIM. P. 52(b); United States v. Olano, 507 U.S. 725 (1993); United States v. Knowles, 29 F.3d 947, 950-51 (5th Cir. 1994).  In order to reverse, we must find that the district court committed an error; that error was "plain" – i.e., "clear" or "obvious"; that the plain error affected Lankford's substantial rights; and that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  Id. (quoting Olano, 507 U.S. at 736).

In United States v. Lopez, 514 U.S. 549 (1995), the Court set forth three broad categories of activity Congress may regulate consistent with its Commerce Clause power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) those activities substantially affecting interstate commerce.  514 U.S. at 558-59.  Intrastate activities falling within the third category could be regulated if those activities were economic in nature, id. at 559-61, or if Congress included a jurisdictional element that allowed for case-by-case

intimate partner, shall be punished as provided in
subsection (b).
18 U.S.C. § 2261(a)(1).

[3]     Lankford cites to section 5 of the Fourteenth Amendment as well, but makes no specific argument regarding how § 2261(a)(1) is outside the scope of Congress' section 5 power. Given this, and our disposition of the issue, we do not address whether Congress' enactment of § 2261(a)(1) is consistent with that power.

11

assessment of whether the regulated activities substantially affected interstate commerce. Id. at 561. Lankford asserts that § 2261(a)(1) punishes conduct that is purely intrastate, private, and noncommercial, and that has no substantial effects on interstate commerce. He also characterizes the provision as an attempt to regulate purely local activities in a manner contrary to the principles of federalism. In making these arguments, it is clear that Lankford defines the regulated conduct as domestic violence and places that conduct in the third of Lopez's categories.

We find that Congress was well within its Commerce Clause power in enacting § 2261(a)(1). The provision properly falls within the first of Lopez's categories as it regulates the use of channels of interstate commerce – i.e., the use of "the interstate transportation routes through which persons and goods move," United States v. Bailey, 115 F.3d 1222, 1226 (5th Cir. 1997) (quoting United States v. Parker, 911 F. Supp. 830, 842 (E.D. Pa. 1995)), cert. denied, 118 S. Ct. 866 (1998) – to further or facilitate domestic violence. See S. REP. NO. 103-138, at 43 (1993) ("[T]itle II creates a Federal remedy for interstate crimes of abuse including crimes committed against spouses or intimate partners during interstate travel and crimes committed by spouses or intimate partners who cross State lines to continue the abuse."); id. at 62 ("This section creates a new chapter in the Criminal Code to punish spouse abusers who cross State lines to continue abuse."). It has long been held that Congress may

12

forbid or punish the use of channels of interstate commerce "to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state of origin," <u>Brooks v. United States</u>, 267 U.S. 432, 436 (1925). <u>See</u> <u>Heart of Atlanta Motel, Inc. v. United States</u>, 379 U.S. 241, 256 (1964)("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'")(quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 491 (1917)); <u>North American Co. v. SEC</u>, 327 U.S. 686, 705 (1946)("Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature."). As a result, that violence against a spouse is a private or noncommercial activity is of no moment.

Other courts confronted with challenges to various provisions within VAWA's § 40221(a) have similarly found that those provisions fall within <u>Lopez</u>'s first category and are valid exercises of Congress' Commerce Clause power. <u>See</u> <u>United States v. Page</u>, 167 F.3d 325, 334 (6th Cir. 1999)("Because the triggering factor of § 2261(a)(2) is the movement of the victim across state lines, this statute falls into the first category and is a valid exercise of Congress's power to regulate the use of the channels of interstate commerce.")(internal quotation marks omitted); <u>United States v. Gluzman</u>, 154 F.3d 49, 50 (2d

13

Cir. 1998)(adopting holding of court below that § 2261(a)(1) is a valid exercise of Congress' Commerce Clause power), cert. denied, 119 S. Ct. 1257 (1999); United States v. Von Foelkel, 136 F.3d 339, 341 (2d Cir. 1998)(upholding § 2262(a)(1) as it falls within Lopez's first category); United States v. Wright, 128 F.3d 1274, 1276 (8th Cir. 1997)(upholding § 2262(a)(1) as it "falls within Congress's authority to 'keep the channels of interstate commerce free from immoral and injurious uses.'")(quoting Caminetti, 242 U.S. at 491), cert. denied, 118 S. Ct. 1376 (1998); United States v. Gluzman, 953 F. Supp. 84, 89 (S.D.N.Y. 1997)(upholding § 2261(a)(1) as it falls within Lopez's first category), aff'd, 154 F.3d 49 (2d Cir. 1998); cf. United States v. Bailey, 112 F.3d 758, 766 (4th Cir.)(relying on Caminetti, 242 U.S. at 491, and Cleveland v. United States, 329 U.S. 14, 19 (1946), to find § 2261(a) constitutional), cert. denied, 118 S. Ct. 240 (1997). The Fourth Circuit's opinion in Brzonkala v. Virginia Polytechnic Inst., 169 F.3d 820 (4th Cir. 1999), cert. granted sub nom., United States v. Morrison, 1999 WL 459152 (U.S. Sept. 28, 1999), cited by Lankford in support of his challenge, is not to the contrary. The Brzonkala court faced a challenge to 42 U.S.C. § 13981(b), and specifically noted that § 2261 was not in issue in that case. Id. at 827. Because we view § 2261(a)(1) as a regulation of the use of channels of interstate commerce, we need not address whether domestic violence "substantially affects"

14

interstate commerce, as required under <u>Lopez</u>'s third prong.[4]  <u>See</u> <u>United States v. Robertson</u>, 514 U.S. 669, 671 (1995)(per curiam). Because § 2261(a)(1) is within Congress' Commerce Clause power, there is no error in convicting Lankford of violating that statute.

### III. CHALLENGES TO JUDICIAL AND PROSECUTORIAL CONDUCT

### A. Judge's Comments and Questions

Lankford asserts that the court's questioning of the witnesses and other comments before the jury prejudiced him and denied him the right to a fair trial.  He alleges that the judge's conduct during the trial evidenced his view that the defendant was guilty of the crimes charged, and that this conduct influenced the jury's verdict.  In support of this contention, he points out that the judge interrupted the defendant's cross-examination and recross of the prosecution's primary witness, Joanie Lankford, twenty-four times, but interrupted the Government's direct and redirect of the same witness only five times.  Similarly, the defense's direct examination of Lankford was interrupted thirty-three times, and the prosecution's cross and recross of the defendant was interrupted only fifteen times. Lankford also insists that the court assisted the Government in

---

[4]     In dicta, the <u>Brzonkala</u> court suggested it viewed § 2261 as a provision that included a jurisdictional element "to ensure, through case by case inquiry that each specific application of the regulation involves activity that in fact affects interstate commerce."  <u>Lopez</u>, 514 U.S. at 561; <u>see</u> <u>Brzonkala</u>, 169 F.3d at 836 (contrasting § 13981(b), which the court viewed as including no jurisdictional element, with § 2261 and § 2262).

its opening statement in jury voir dire, and that prejudice resulting from the judge's behavior was such that it could not be cured by jury instructions.

When, as here, no objections were raised at trial, we review challenges to judicial conduct for plain error. See, e.g., United States v. Saenz, 134 F.3d 697, 701 (5th Cir. 1998). We must determine whether constitutional error was committed – i.e., whether "the district judge's actions, viewed as a whole, . . . amount[ed] to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor." United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994). In making this determination, we consider the totality of the circumstances, see United States v. Lance, 853 F.2d 1177, 1182 (5th Cir. 1988), which "must show that the trial judge's intervention was 'quantitatively and qualitatively substantial'." Saenz, 134 F.2d at 702 (quoting Bermea, 30 F.2d at 1569).

Although Lankford sees Saenz as similar to his own case, we do not find that the exchanges he identifies approach the nature, or the level of misconduct found in that case. Cf. United States v. Cantu, 167 F.3d 198, 203 (5th Cir.) (stressing the unique circumstances involved in Saenz), cert. denied, 120 S. Ct. 58 (1999). The vast majority of the exchanges occurred because the court legitimately sought clarifications and attempted to move the proceedings along. The mere fact that there were more interruptions on one side or the other does not suggest, without

16

more, that the judge has predetermined the guilt of the defendant or is assisting the prosecution.  See Bermea, 30 F.3d at 1570 ("[A]lthough the frequency of a court's interruptions of defense counsel is significant, the nature of those interruptions is more pertinent to our inquiry."); United States v. Williams, 809 F.2d 1072, 1086-87 (5th Cir. 1987).  The judge's elicitation of "damaging information" in the course of questioning witnesses is also, by itself, insufficient to demonstrate that the judge was engaged in misconduct.  As we have previously noted,

> "a federal judge . . . may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion.  Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial."

Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979) (citations omitted).  A review of the entire record, including statements made in voir dire, does not demonstrate that the judge "stray[ed] from neutrality" during Lankford's trial.  Moreover, the judge explicitly instructed the jury to disregard anything he may have said during the trial in their determinations of witness credibility, of the weight to be given testimony, and in their findings of fact.[5]  Such curative instructions can operate

---

[5]      The judge's instructions regarding his comments were as follows:
> During the course of a trial I occasionally make comments to the lawyers, or ask questions of a witness, or admonish a witness or a lawyer.  If you have seen anything which you interpret as my opinion as to the facts of the case or the credibility of a witness, you are to disregard it.  You are the jury and I am not. Except for my instructions to you on the law, you

17

against a finding of constitutional error.  See Bermea, 30 F.3d
at 1571-72.

## B. Prosecutor's Closing Argument

Lankford points to several statements made by the prosecutor
in his closing argument as operating to deprive him of a fair
trial.  He argues that the lower court erred in overruling a
defense counsel's objection to the following statements:

> The psychologist thinks Joanie's manipulating him
> because I guarantee you he goes in there July 31st –
> July 28 – I'm getting the date wrong, I'm sorry.  The
> duct tape, she spent the night last night, Doctor, she
> said she loved me.  She came home.  Well, that's not
> what happened.[6]

According to Lankford, in making these statements, the prosecutor
guaranteed the existence of a fact and described a meeting

---

should disregard anything I may have said during the
trial in arriving at your own findings as to the facts
of the case, the credibility of the witnesses, and the
weight to be given their testimony.

[6]     Lankford adds two lines to this statement, noting that
the prosecutor said "The doctor doesn't know Joanie.  Saw her on
a limited occasion, but he knows this man, doesn't he?"  These
two sentences, however, came after defense counsel's objection,
and were themselves not the subject of an objection.  As a
result, we do not consider the two sentences part of the
challenged statement.  Lankford's argument with regard to these
two sentences alleges that they were outside the record, and that
in fact, the psychologist saw Joanie "separately from [Lankford]
and saw her together with [Lankford] on other occasions."  A
review of the psychologist's testimony, however, reveals that the
sessions that included Joanie either individually or together
with her husband numbered at most, three over a one month period,
that he did not conduct a psychological evaluation of Joanie,
that he saw Joanie much less often than he saw Lankford, whom he
testified he saw regularly between February 1995 and August 1995,
and that his characterizations of the Lankford marriage were
based entirely on information supplied by Lankford.  As a result,
we do not see the prosecutor's statements as "outside the
record."

between the psychologist and Lankford that was not reflected in the record. As a result of the court's error, he argues, the Government was able to destroy the psychologist's testimony, which itself was detrimental to the testimony of Joanie Lankford.

Lankford also objects to the prosecutor's twice referring to him as "this psycho," to his statements that Lankford was seeing a psychologist, one of which suggested reasons he was seeing a psychologist, and to his description of Lankford as "too obsessed" to leave his wife alone. These statements, Lankford contends, reflected the prosecutor's improper assumption of the role of an "expert" able to diagnose his mental state. There were no objections to these statements at the time of trial.

In general, we apply a two-step analysis to charges of prosecutorial misconduct. We first decide whether the prosecutor's comments were improper. See United States v. Gallardo-Trapero, 185 F.3d 307, 320 (5th Cir. 1999); United States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998), cert. denied, 119 S. Ct. 887 (1999). If the comments are found to be improper, we next assess whether they prejudiced Lankford's substantive rights. See Gallardo-Trapero, 185 F.3d at 320; Munoz, 150 F.3d at 415. Here, we consider "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995) (quoting United States v. Simpson, 901 F.2d 1223, 1227 (5th Cir. 1990)).

19

Even if we were to find that each of the statements to which Lankford objects was improper, he would not be entitled to reversal or other correction because the prosecutor's statements did not affect Lankford's substantial rights.[7] First, a review of the remarks in context of the trial, see Munoz, 150 F.3d at 415, suggests that the comments' prejudicial effects, if there were any, were insubstantial. Second, the cautionary instructions given to the jury were sufficient to negate any prejudicial effects the statements may have had. Finally, substantial evidence of defendant's guilt exists in the record. This is simply not a case in which improprieties were such as to cast "serious doubt upon the correctness of the jury's verdict," see United States v. Hernandez-Guevara, 162 F.3d 863, 874 (5th Cir. 1998), cert. denied, 119 S. Ct. 1375 (1999), and thus we see no reason to reverse.[8]

IV. CHALLENGES RELATED TO THE JURY VERDICT

Lankford raises several points of error related to the

---

[7]     We review Lankford's challenge to the prosecutor's description of an interchange between the psychologist and Lankford for harmless error, and other challenges to the prosecutor's closing argument for plain error. See FED. R. CRIM. P. 52(b). Under each standard, we must find error that affected Lankford's substantial rights before that error can be noticed. Id.

[8]     Lankford also challenges the district court's sustaining  an objection to defense counsel statements in closing argument. The Government objected to the following defense counsel comments: "When you read the charge, it's going to talk about accident or mistake.  If she convinces him that she is consenting, the mistaken fact of consent is an absolute defense . . . ."  Because those statements described neither the charge nor extant law correctly, the district court did not err in sustaining the Government's objection.

20

jury's verdict.  First, he argues that the court did not explain the meaning of "willfully" when it instructed the jury as to the elements of interstate domestic violence and of kidnapping. Second, he insists that there was insufficient evidence to support his conviction of interstate domestic violence (Count 1), kidnapping (Count 2), and of use, or carrying of a firearm during and in relation to a crime of violence (Count 3).

## A. Jury Instructions

Because Lankford did not challenge his jury instructions at trial, we review for plain error.  See FED. R. CRIM. P. 52(b); United States v. Davis, 19 F.3d 166, 169 (5th Cir. 1994).  "Plain error occurs only when the instruction, considered as a whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice."  Id.  We find no such error here.

The judge instructed the jury as to the definitions of "knowingly" and "intentionally."  The latter was stated to mean that "the act was committed voluntarily and purposely." "Intentionally," not "willfully," is included in the interstate domestic violence statute.  See § 2261(a)(1).  "Willfully" is included in the kidnapping statute.  See § 1201(a)(1) (providing that the person be "willfully transported").  The court instructed the jury that in order to find Lankford guilty of kidnapping, it had to find that the government proved "that the defendant intentionally transported Joanie Lankford in interstate commerce while so kidnaped or confined."  Considering the jury instruction, as a whole, we do not find that a grave miscarriage

of justice is likely to have occurred because of the absence of the proffered definition of "willfully." Thus, we find no plain error.

### B. Insufficiency of the Evidence

Lankford challenges his conviction of interstate domestic violence principally because there was insufficient evidence to show that (1) he crossed a state line with intent to injure, harass, or intimidate his spouse, and (2) his wife's protestation was sufficient to dispel his mistaken belief that she was consenting to sexual acts. His challenge to his kidnapping conviction rests on arguments regarding his wife's consent to go to Lawton with him and on an absence of evidence that his intent in going to Lawton was for his sexual gratification. Finally, he challenges his conviction of using or carrying a firearm, 18 U.S.C. § 924(c), with arguments that evidence did not support a finding that a "real gun" was used, and that it did not support a finding of a nexus between use or carriage of a firearm and the underlying crimes of violence. As to the latter contention, Lankford points to the absence of evidence that showed he used or carried a gun after stopping at a rest stop in Texas.

Lankford raised sufficiency of evidence arguments in his Rule 29 motion, and thus preserved these issues for appeal. In reviewing challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the jury verdict and will affirm "if a rational trier of fact could have found that the government proved all essential elements of the crime beyond

a reasonable doubt." United States v. Castro, 15 F.3d 417, 419 (5th Cir. 1994). "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence." United States v. Westbrook, 119 F.3d 1176, 1189 (5th Cir. 1997) (citing United States v. Salazar, 66 F.3d 723, 728 (5th Cir. 1995)).

As the lower court noted when considering Lankford's sufficiency of evidence arguments, the jury in this case was confronted with two diametrically opposed versions of what happened on August 8 and 9. In light of the verdict, it is clear that the jury chose to give more credibility to Joanie Lankford's testimony than to her husband's. This is exactly the type of decision juries are called upon to make, see United States v. Restrepo, 994 F.2d 173, 182 (5th Cir. 1993) ("The jury is the final arbiter of the weight of the evidence, and of the credibility of witnesses."), and, unless testimony is incredible as a matter of law, we will not disturb the jury's findings. See United States v. Freeman, 77 F.3d 812, 816 (5th Cir. 1996).

Joanie Lankford's testimony neither "asserts facts that [she] physically could not have observed," nor asserts "events that could not have occurred under the laws of nature." Id. As a result, we must accept that the jury found that Joanie Lankford consented to neither being taken to Lawton, nor to sexual activity while there. We also find that the record contains sufficient evidence to support the jury's findings that the

23

government met its burden in proving that Lankford crossed state lines with the intent to harass, injure or intimidate his wife, that during the course of, or as a result of, such travel, he intentionally committed a crime of violence and thereby caused Joanie Lankford bodily injury. There was also sufficient evidence to support a conviction of kidnapping. Because the Government did not have to show that Lankford's intent in crossing state lines was to obtain sexual gratification in order to prove kidnapping under § 1201, an absence of evidence to that effect is irrelevant. See United States v. Osborne, 68 F.3d 94, 100 (5th Cir. 1995) (describing elements of § 1201(a)(1)).

With regard to his conviction under § 924(c), Lankford asserts that there is insufficient evidence because the Government did not admit an actual gun into evidence and because his wife testified that she did not know (versus did not believe) that what he was carrying was in fact a "real" gun. Although to date we have not detailed the nature of the evidence the government is entitled to rely on in attempting to prove a firearm was used or carried for purposes of § 924(c), a number of our sister circuits have considered the issues Lankford raises. See United States v. Hunt, 187 F.3d 1269, 1270-71 (11th Cir. 1999); United States v. Beverly, 99 F.3d 570 (3d Cir. 1996); United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995); United States v. Moore, 25 F.3d 563, 568-69 (7th Cir. 1994); United States v. Jones, 16 F.3d 487, 490-91 (2d Cir. 1994); United States v. Hamilton, 992 F.2d 1126, 1129 (10th Cir. 1993); United

24

States v. Jones, 907 F.2d 456, 460 (4th Cir. 1990); Parker v. United States, 801 F.2d 1382, 1384-85 (D.C. Cir. 1986).  We agree with the principle emerging from these opinions:  The Government is not required to produce the actual weapon allegedly used, possessed, or carried and may rely on testimony, including the testimony of lay witnesses, in its attempt to prove that a defendant used, possessed or carried a "firearm" as that term is defined for purposes of § 924(c).  See 18 U.S.C. § 921(a)(3).  A review of the record with this principle in mind leads to the conclusion that a sufficient basis for a jury finding that Lankford used or carried a firearm exists.

Lankford's argument regarding the use or carriage of a gun at the time state lines were crossed has been previously rejected by this court, see United States v. Ivy, 929 F.2d 147, 151-52 (5th Cir. 1991), and the Supreme Court's subsequent decisions in Smith v. United States, 508 U.S. 223 (1993), and Bailey v. United States, 516 U.S. 137 (1995), do not provide us with reasons to consider that argument meritorious at this juncture.  There is sufficient evidence to support a jury's finding that Lankford used a gun "during" the kidnapping and "in relation" to that kidnapping.  A showing that Lankford also used a gun during and in relation to his sexually abusing his wife is not required to sustain his conviction.

V. CHALLENGES TO THE SENTENCE

**A. Multiplicitous Counts and Double Jeopardy**

Lankford challenges the district court's denial of his

25

motion seeking to force the government to eliminate either Count 1 or Count 2 of the indictment, an act argued to be required because the two counts are multiplicitous.  Counts 1 and 2, Lankford argues, charge a single kidnapping offense.[9]  Because the jury instructions did not restrict the jury to finding guilt on Count 1 only on the basis of finding guilt of sexual abuse, the jury may have convicted him of kidnapping under Count 2, and interstate domestic violence by kidnapping in Count 1.  Moreover, he contends that his conviction and sentence violates the Double Jeopardy Clause, U.S. CONST. amend. V, because kidnapping is a lesser included offense of interstate domestic violence.  See Rutledge v. United States, 517 U.S. 292, 301 (1996) ("As long as [18 U.S.C.] § 3013 stands, a second conviction will amount to a second punishment."); Brown v. Ohio, 432 U.S. 161, 168 (1977) (concluding that "a greater offense is . . . by definition the 'same' for purposes of double jeopardy as any lesser offense included in it.").  Although Lankford did not raise his Double Jeopardy arguments below, we may consider them.  See FED. R. CRIM. P. 52(b); United States v. Stovall, 825 F.2d 817, 821 (5th Cir. 1987) ("A complaint about multiplicity of sentences . . . can be

---

[9]    Count 2 of the indictment charges Lankford with kidnapping in violation of 18 U.S.C. § 1201; Count 1 of the indictment alleges that on or about August 8, 1995, Lankford
did travel across a state line from Wichita Falls, Texas in the Northern District of Texas, to Lawton, Oklahoma, in the Western District of Oklahoma, with the intent to injure, harass, and intimidate his spouse, Joanie Lankford, and in the course of and as a result of such travel, the defendant did intentionally commit crimes of violence, to wit, kidnapping and sexual abuse and thereby caused bodily injury to Joanie Lankford.

26

raised for the first time on appeal."). We review questions of multiplicity de novo. See United States v. Soape, 169 F.3d 257, 265 (5th Cir.), cert. denied, 119 S. Ct. 2353 (1999); United States v. Flores-Peraza, 58 F.3d 164 (5th Cir. 1995). Because the double jeopardy arguments are being considered for the first time on appeal, we review for plain error.

In general, two counts are multiplicitous when a single offense is charged under more than one count of an indictment. See Soape, 169 F.3d at 266 (citing United States v. Nguyen, 28 F.3d 477, 482 (5th Cir. 1994)). "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." United States v. Cluck, 143 F.3d 174, 179 (5th Cir. 1998) (quoting United States v. Swaim, 757 F.2d 1530, 1537 (5th Cir. 1995)), cert. denied, 119 S. Ct. 808 (1999). The primary test for whether a single offense has been charged in an indictment and for whether a defendant has been punished twice for the same offense is that offered in Blockburger v. United States, 284 U.S. 299 (1932): "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." 284 U.S. at 304; see, e.g., Rutledge, 517 U.S. at 297 (identifying the Blockburger test as the principal test for determinations of whether the Double Jeopardy Clause has been violated); Soape, 169 F.3d at 266 (applying the

27

Blockburger test to question of whether indictment was multiplicitous).  In applying this test, we examine not the particular circumstances involved in the case before us, but the statutory elements.  See Soape, 169 F.3d at 266 ("The focus in determining the issue of multiplicity is on the statutory elements of the offenses, not on their application to the facts of the specific case before the court."); United States v. Singleton, 16 F.3d 1419, 1422 (5th Cir. 1994) ("Determining whether statutory offenses are separate for double jeopardy purposes involves parsing the statutes apart from the facts of any particular case.").

An application of the Blockburger test reveals that Counts 1 and 2 of Lankford's indictment are not multiplicitous.  The kidnapping statute requires that the state show that the victim was  abducted and was held for purposes beneficial to the kidnapper at the time state lines were crossed.  The interstate domestic violence statute requires that the victim be a spouse or intimate partner of the defendant, that the defendant crossed state lines with the intent to injure, harass, or intimidate the victim, that a crime of violence was engaged in intentionally either in the course of or as the result of such travel, and that as a result of that crime of violence, bodily injury to the victim occurred.  It can therefore be said that a kidnapping conviction requires proof of a fact not required by the interstate domestic violence statute (e.g., that the victim be held for purposes beneficial to the defendant at the time state

28

lines were crossed), and that a conviction for interstate domestic violence requires proof of a fact not required by the kidnapping statute (e.g., that the victim be a spouse or intimate partner, that bodily injury to the victim resulted).  See United States v. Sickinger, 179 F.3d 1091, 1093 (8th Cir. 1999)(identifying facts that are unique to both § 1201(a) and § 2261(a)); United States v. Bailey, 112 F.3d 758, 766-67 (4th Cir. 1997) (same); United States v. Frank, 8 F.Supp.2d 253, 282 n.26 (S.D.N.Y. 1998) (same).  Moreover, we cannot say that the district court committed plain error when it determined Lankford's sentence.  That kidnapping is a lesser included offense of interstate domestic violence is by no means clear or obvious under current law.  See United States v. Olano, 507 U.S. 725, 734 (1993) (defining "plain" error to be error that is "clear" or "obvious"); Sickinger, 179 F.3d at 1093 (considering whether kidnapping was a lesser included offense within interstate domestic violence and finding no plain error).

## B. Sentence for Interstate Domestic Violence

Lankford was given a sentence of 135 months imprisonment for his conviction of interstate domestic violence.  He contends, for the first time on appeal, that his sentence for violating § 2261(a)(1) exceeds the statutory maximum, because evidence supports an offense of aggravated sexual abuse as defined in 18 U.S.C. § 2241, an offense he was not charged with committing, but does not support an offense of sexual abuse as defined in 18 U.S.C. § 2242(1).  As a result, he argues, he cannot be sentenced

under § 2261(b)(4), which dictates that a person violating § 2261(a) "shall be fined under this title, imprisoned . . . as provided for the applicable conduct under chapter 109A if the offense would constitute an offense under chapter 109A . . . ." Instead, he must be sentenced under § 2261(b)(5), which specifies a term of not more than five years. Because Lankford's argument requires that we interpret § 2261(b)(4), we review the district court's action de novo, see United States v. Hebert, 131 F.3d 514, 525 (5th Cir. 1997), cert. denied, 118 S. Ct. 1571 (1998), and in this case must determine whether the court committed plain error. See United States v. Martinez-Cortez, 988 F.2d 1408, 1410 (5th Cir. 1993).

Section 2261(b) provides for penalties that vary according to the degree of the injury sustained by the victim. See United States v. Page, 167 F.3d 325, 334 (6th Cir. 1999). The language of § 2261(b)(4) instructs that if "the offense would constitute an offense under chapter 109A," then the penalties "as provided for the applicable conduct under chapter 109A" are applicable, "without regard to whether the offense was committed in the special maritime and territorial jurisdiction of the United States or in a Federal prison." We find that the district court did not commit an obvious error in interpreting § 2261(b)(4) to be applicable to the circumstances of this case.

<h2 style="text-align:center">IV. CONCLUSION</h2>

For the foregoing reasons, we AFFIRM Lankford's conviction and sentence.